IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | * |
| **CHARLES B. VAN HORN, JR.,** | * CHAPTER 13 |
| Debtor | * |
| | * CASE NO. 1:10-bk-07373MDF |
| **METRO BANK,** | * |
| Movant | * |
| | * |
| v. | * |
| | * |
| **CHARLES B. VAN HORN, JR.** and | * |
| **CHARLES J. DEHART, III,** Standing | * |
| **Chapter 13 Trustee,** | * |
| Respondents | * |

## **OPINION**

Before me is a Motion for relief from the automatic stay filed by Metro Bank ("Metro") in the bankruptcy case of Charles B. Van Horn, Jr. ("Debtor"). For the reasons that follow, the Motion will be granted.

### **I. Procedural History**

On September 9, 2010, Debtor filed a Chapter 13 bankruptcy petition. His schedule of real estate listed a parcel of land with several improvements on East Canal Road, East Hanover Township, Pennsylvania (hereinafter "the Property").[1] The Property was scheduled as having a value of $1.5 million with a lien against it of $400,000 held by Metro. Debtor proposes to fund his Chapter 13 Plan through the sale of the Property.

Metro's lien arose from a promissory note and mortgage executed by Debtor on July 7, 2005 as consideration for a loan of $400,000. Payments scheduled under the terms of the note were $3187.53 for sixty months and $3237.52 for 179 months with a balloon interest payment of

---

[1]The parcel contains structures identified as 605, 675 and 675 A East Canal Road. Debtor resides in one of the structures. The others are commercial rental units.

$20,463.45 due on July 7, 2025. On the date of the hearing, the outstanding balance on the loan was $402,223.61. Metro's lien is a first mortgage, but is subordinate to two municipal tax liens in the respective amounts of $18,026.48 and $2349.01. The aggregate amount of Metro's lien and the two tax liens is $422,599.09.

On December 26, 2010, Metro filed its Motion alleging that Debtor had ceased making payments on the note in May 2010 and had failed to provide other adequate protection as required under 11 U.S.C. § 362(d)(1). Metro also alleged cause for relief from the stay under § 362(d)(2) claiming that Debtor has no equity in the Property and that it is not necessary for an effective reorganization. On January 10, 2011, Debtor filed an Answer that generally opposed the relief sought in the Motion but otherwise did not specify a factual or legal basis for opposing the relief.

At a hearing held on March 10, 2011, Debtor adduced evidence that Metro's interest in the Property is adequately protected by an ample equity cushion based upon the Property's value of $1.25 million. W. Greg Rothman ("Rothman"), a licensed real estate broker and state certified appraiser whom Debtor had retained to sell the Property, listed the Property at $1.5 million. Metro objected to Rothman's competency to offer an opinion as an expert, but I allowed his testimony pending the filing of post-trial briefs on issues raised in Metro's objection. Metro adduced evidence from its own expert witness, Mark Heckman ("Heckman"), who had prepared a formal appraisal in which he valued the Property at $440,000.

The parties have filed their respective briefs on the matter, and it is ready for decision.[2]

---

[2] I have jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(G). This Opinion and Order constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is

Case 1:10-bk-07373-MDF    Doc 46    Filed 05/19/11    Entered 05/19/11 15:44:02    Desc
                        Main Document      Page 2 of 15

## II. Factual Findings

### *A. The Property*

The Property is a 13.28-acre tract located in East Hanover Township, Dauphin County, Pennsylvania, in an area zoned for "rural/agricultural" uses. Heckman's appraisal described East Hanover Township as "generally rural in development," with a population of 5322 as of the 2000 United States Census. Heckman further indicated that while East Hanover Township is within approximately three miles of Hershey, Pennsylvania and within approximately thirteen miles of the City of Harrisburg, historically, it has not attracted significant residential or commercial real estate development. Debtor did not challenge Heckman's testimony on this point.

Seven separate structures are located on the Property – an eight-unit apartment building, a two-story warehouse with one apartment, a single-story warehouse, a farmhouse, a barn, a mobile home, and a garage used for vehicle repair ("Auto Repair Garage"). At the time the appraisal was performed, numerous abandoned vehicles[3] were located on a one-acre area adjacent to the Auto Repair Garage.

The eight-unit apartment building consists of two levels with four units on each level. The building contains approximately 6000 square feet of space. Each apartment unit contains one bedroom, one bath, a kitchen, and a living area in approximately 750 square feet of space. Heckman characterized the condition of the apartments as "fair." This description was generally supported by the photographs contained in Heckman's appraisal report. Debtor did not challenge

---

applicable to contested matters pursuant to FRBP 9014.

[3]Debtor estimated the number of vehicles at fifteen to twenty. Due to significant snow cover at the time of his appraisal, Heckman was unable to provide an estimate of the number of vehicles, but his report indicated that there were "many" on the Property.

this description, although he indicated that he was in the process of renovating certain units. At the time of Heckman's appraisal, three of the apartments on the property were occupied, while a few of the vacant apartments were in the process of renovation.

The two-story warehouse consists of approximately 8000 square feet of space. It is constructed of concrete block and is unheated. The single apartment in this building, which is heated, was rented at the time of Heckman's appraisal. Two garage doors allow entry to the main storage space. The appraisal report described the storage area as "packed full of personal property" at the time of inspection. The photographs included in the appraisal confirmed that hundreds of items, large and small, were jammed into the space – a fifty-five gallon drum, a used beer tap and stand, some glass display cases, some car tires, a recliner, some mattresses and box springs, some window screens and doors, at least three coin operated laundry machines. Heckman opined that even if emptied of its contents, the building would be difficult to rent in the rural East Hanover Township area. Again, Debtor did not challenge Heckman's opinion on this point.

The one-story warehouse is also constructed of concrete block. Heckman's appraisal report did not contain an estimate of the square footage of this structure, but described it as a "very long and narrow large storage building." It has a "newer roof" and new electric service, two oil furnaces, and a large open space with an office area on one end. In his report, Heckman stated that the storage area in the warehouse was "packed full of the owner's personal property." The farm house consists of 1764 square feet of living space containing a living room, dining room, kitchen, and half-bath on the first level and with four bedrooms and a bath on the second level. Heckman estimated the age of the structure to be approximately 100 years. He opined that

the "overall quality is average, and the condition is fair." The house has a natural stone foundation and aluminum exterior siding. The type, condition, and age of the roof is not described in the appraisal report. The home is serviced by an oil/hot water heating system, a well that it shares with the Auto Repair Garage, and a separate septic system.

The appraisal report provided few details to describe the mobile home. It has oil heat, two bedrooms and one bath. Heckman stated that the home was "nearing the end of its economic life, and has no contributory value" to the Property. The photographs show an older "single wide" unit surrounded by weeds and a few shrubs. Access to the interior is obtained through a small porch partially covered by a roof. The lone photograph of the interior shows a cluttered kitchen lighted with a bare bulb.

Like the mobile home, the barn is described as being "near the end of its economic life, and contribut[ing] no value" to the Property. Again, Heckman's opinion of the barn's value was not challenged by Debtor.

### B. Rental Income

Debtor resides in the mobile home; therefore, it generates no income. The rental amounts for the apartments ranged from $525 to $650 per month.[4] The farmhouse was also occupied by a residential tenant at the time the appraisal was conducted.[5] Heckman described the barn as essentially abandoned, in need of substantial repair work, and of no commercial value. Debtor

---

[4]Heckman's appraisal listed the highest rent amount at $625, but Debtor's testimony set the figure at $650. For purposes of this Opinion, I will accept Debtor's testimony inasmuch as it has no impact on the outcome.

[5]Heckman's appraisal report stated that the monthly rent amount was $1000, but Debtor testified that he receives $850 per month from a tenant who has resided there for a number of years. The discrepancy was not addressed in the testimony of either witness.

5

did not challenge this description. The Auto Repair Garage was also being rented at the time of the appraisal, generating income to Debtor of $1200 per month. Neither of the warehouses were rented at the time of the appraisal, and Heckman opined that the East Hanover Township real estate market was unlikely to produce tenants for these units.

### C. Environmental concerns

Heckman testified that because numerous junked automobiles litter the Property, before it can be properly marketed for sale, a "Phase I" environmental study must be conducted. Heckman's appraisal report further showed that the Property is bisected by a small creek, rendering approximately one and one-half acres of the site unsuitable for development due to flooding.

### D. Debtor's efforts to market the Property for sale

In January 2011, Debtor executed a listing contract with RSR Realtors to market the Property for $1.5 million. At the time of the hearing, no offers of purchase had been received. Debtor testified that he had received and rejected an offer to purchase the Property for $2.2 million approximately two or three years prior to filing his bankruptcy petition. No other evidence of potential sales was presented.

### III. Discussion

Metro's Motion asserts cause for relief from the stay under both paragraphs (1) and (2) of § 362(d). I will address each paragraph separately.

### A. 11 U.S.C. § 362(d)(1)

Under § 362(d)(1), a bankruptcy court is required to grant relief from the stay to a moving party upon a showing of "cause, including the lack of adequate protection of an interest in

6

property" against which the movant holds a security interest. 11 U.S.C. § 362(d)(1). Generally, the decision whether or not to lift the automatic stay is within the sound discretion of the bankruptcy court. *Laguna Assoc. Ltd. P'ship v. Aetna Casualty & Surety Co.(In re Laguna Assoc. Ltd. P'ship),* 30 F.3d 734, 737 (6th Cir. 1994); *MacDonald v. MacDonald (In re MacDonald)*, 755 F.2d 715 (9th Cir. 1985). The party requesting relief from the stay under § 362(d)(1) has the burden of proving that the debtor lacks equity in the property, while the debtor has the burden on all other issues. 11 U.S.C. § 362(g); *Drake v. Franklin Equipment Co. (In re Franklin Equipment Co.*), 416 B.R. 483, 522 (Bankr. E.D. Va. 2009).

The term "adequate protection" is not specifically defined in the bankruptcy statute. *See Household Finance Corp. v. Adams (In re Adams)*, 27 B.R. 582, 584 (D. Del. 1983). However, the purpose of providing adequate protection is "to insure that the creditor receives the value for which the creditor bargained prebankruptcy." *Mbank Dallas N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1396 (10th Cir. 1987). "[V]alue is the linchpin of adequate protection." *Id.*

"A substantial 'equity cushion' can provide adequate protection" to ensure that a secured creditor receives the benefit of his bargain. *In re Colonial Center, Inc.,* 156 B.R. 452, 460 (Bankr. E.D. Pa. 1993), *quoted in In re Franklin Equipment Co.*, 416 B.R. at 528. "[I]f a debtor has equity in a property sufficient to shield the creditor from either the declining value of the collateral or an increase in the claim from accrual of interest or expenses, then the creditor is adequately protected." *In re Colonial Center*, *Inc*. 156 B.R. at 460 (citations omitted). Whether an equity cushion adequately protects a creditor's claim is determined by the circumstances of a particular case. *Id.* To calculate the value protecting a lien, the value of the collateral is measured

7

against the amount of the movant's secured claim plus any secured claims senior to the movant's claim. *In re Liona Corp., N.V.*, 68 B.R. 761, 767 (Bankr. E.D. Pa. 1987).

To satisfy its burden of proof in the matter before me, Metro offered Heckman's testimony regarding his post-petition appraisal, which valued the Property at $440,000. As indicated in the Procedural History, the sum of Metro's secured claim plus the senior tax liens is $422,599.09.[6] Thus, by Metro's own evidence, the value of the Property exceeds the sum of the Metro's lien and the tax liens by $17,401.

Debtor asserts that the value of the Property is substantially higher than $440,000, thus providing Metro with even greater protection. To rebut Metro's evidence as to the value of the Property, Debtor called Rothman to testify that the listing price of the Property, $1.5 million, was equivalent to its fair market value. Metro challenged Rothman's testimony on three grounds: 1) that Rothman does not possess the required state license to appraise real estate or testify as an expert regarding the value of real property; 2) that ethical rules governing the conduct of licensed real estate professionals prohibit the listing agent for a property from testifying as an expert regarding that property's value; and 3) that even if Pennsylvania licensure laws did not preclude his testimony, Rothman's opinion of the Property's value is not credible. The evidence established that Rothman is a certified general real estate appraiser. However, because I find Heckman's testimony to be more persuasive than Rothman's, I need not address the issue of whether Rothman's testimony violated the ethical canons of his profession.

---

[6] Metro's motion indicates that an individual, Dennis Hess, holds a lien in the approximate amount of $220,000 that is subordinate to Metro's lien. As discussed in *Liona*, the only relevant liens in a motion under § 362(d)(1) are those of the movant and any liens superior to the movant's.

8

*1. Heckman's testimony*

At the hearing, Debtor did not question Heckman's professional credentials or otherwise contest his competence to provide expert testimony to estimate the value of the Property. In preparation for his testimony, Heckman performed an extensive appraisal,[7] and the 146-page report of his findings was admitted into evidence without objection . The appraisal documented his use of two separate valuation methods to arrive at his conclusions – the sales comparison approach and the income capitalization approach. Under the former approach, Heckman valued the Property at $460,000; under the latter approach he calculated the value at $415,000. Considering both approaches, Heckman appraised the value of the Property at $440,000.[8]

Heckman's report contained a detailed analysis of value through the sales comparison approach.[9] For this portion of his report, Heckman considered the Auto Repair Garage as a single saleable property, with the farmhouse, apartment, and warehouse buildings (collectively, the "Rental Units") as a separate parcel. Heckman compared the Rental Units to recent sales of six similar properties in the general market region. He chose five "comparables" for the Auto

---

[7] At the hearing, Rothman conceded that Heckman's report was "very thorough."

[8] Heckman testified at the hearing that he gave equal weight to these valuation methods to reach his final figure of $440,000.

[9] The appraisal report noted that the Property could be used for various purposes, including development as a residential community. Accordingly, Heckman analyzed its value by comparing the Property to other vacant lands that were ultimately developed by residential building contractors. However, the report did not consider this to be the "highest and best" use of the Property when costs of demolishing existing structures and the general location of the Property were considered. Because Heckman determined that residential development is not the highest and best use of the Property, I will not factor into my analysis any of his calculations and estimates to the extent they are based on the sale of comparable properties for residential development.

9

Repair Garage. Each of the eleven comparables he selected were similar to the Property in several significant ways, including their location, use, quality of construction, general condition, and aesthetic appeal. Importantly, ten of the eleven sales occurred after the general real estate market collapsed in 2008. Thus, the comparable sales selected for the appraisal are reflective of current market conditions.[10] Heckman's selection of these properties for comparison purposes was not challenged by Debtor. Indeed, Rothman specifically stated that he would not disagree with any of the comparable properties chosen by Heckman. Given the thoroughness of the appraisal report and Debtor's failure to significantly discredit it, I give great weight to Heckman's opinion that the Property may be favorably compared to other similar properties in the area, the average sale price of which was $460,000.

Heckman's report also contained a similarly studied analysis of value through the "income capitalization" approach, which translates property rental income into a sale value by estimating how much a typical investor might pay for a property based solely on its income potential. Based on this approach, Heckman concluded that the market value of the Property to a potential purchaser of residential rental units would be $415,000. To reach this conclusion, he obtained Debtor's records of income for all units currently being rented at the time of the appraisal. He adjusted these figures slightly downward due to the general condition of the apartments, which he found to be only "fair." Based on the adjusted figures, he concluded that the potential gross income for the Property would be $77,400 annually.

---

[10] For the pre-2008 sale, Heckman made a ten percent (10%) downward adjustment of the sale price for comparable property due to the more favorable the market conditions that existed at the time it was sold. (Appraisal report, p. 108).

10

Heckman's appraisal adjusted this annual gross income figure by deducting certain necessary and anticipated costs, including real estate taxes, property insurance, and maintenance, costs resulting from vacancies, and losses due to unpaid rents. Debtor did not effectively challenge Heckman's calculations and estimates in these areas. Based on these figures, Heckman concluded that the net operating income for the Property would be $42,401 annually.

### 2. *Rothman's testimony*

In contrast to Heckman's methodical analysis of the Property, Rothman's testimony was based on his relatively brief visit to the Property and his assessment that, for a specific kind of buyer interested in purchasing a mixed-use property for "hands-on" management and production of personal income, a sales price of $1.25 million would not be an unreasonable price.[11] Rothman's estimate of $1.25 million as a reasonable fair market price also was based on the speculation that the hypothetical purchaser would be able to subdivide and sell the ten-acre tract of vacant land to a housing developer .

Prior to his engagement as the listing agent, Rothman visited the Property for approximately 45 minutes on a single occasion – December 1, 2010. He examined four apartments, but he did not inspect the interior of the farm house or the mobile home. Rothman did not obtain specific information regarding the age of the structures, their types of construction, their service systems (e.g. plumbing, heating and electricity), or the square footage of each building. He reviewed the rental rolls, but did not examine or obtain copies of any individual

---

[11]Rothman testified that the listing price of $1.5 million, a figure $250,000 greater than Rothman's recommended asking price, was determined by Debtor.

11

leases. In short, his view of the Property was not as thorough as Heckman's inspection and his examination of Debtor's business records for the Property was perfunctory.

Rothman agreed to list the Property for sale at $1.5 million based on his opinion regarding the per-unit value of the apartment buildings, the per-acre value of the vacant land, and the individual values of the farmhouse and the Auto Repair Garage.[12] Specifically, he testified as to a per-unit value of $50,000 for each of the eight units in the apartment building,[13] a value of $30,000 per acre for the vacant land (which he estimated comprised ten acres), for a total value of $1.25 million.[14] He based his values on his review of the sales of some comparable properties, but he did not identify these properties, describe their relevant attributes, or provide their dates of sale. Rothman's oral testimony was not supplemented by a written report of any kind.

Given the vagueness of Rothman's testimony, especially as compared to Heckman's appraisal report and testimony, I am not persuaded that the reasonable market value of the Property approximates $1.25 million. Prior to the hearing the Property had been marketed by

---

[12]Rothman's testimony indicated that, like Heckman, he attached no value to either the barn or the mobile home.

[13]He apparently did not attribute a value to the single apartment unit in the two story warehouse building.

[14]Rothman's estimates of value for the apartment units and the acreage total $700,000 ($400,000 + $300,000). The remainder of the $1.25 million figure is apparently comprised of the values of the farmhouse, warehouses and garage, but Rothman did not testify as to precise sales prices for these structures.

12

Rothman for over two months, but no offers of purchase had been received at any price.[15] Given Heckman's report, I must conclude that the asking price is grossly inflated.

Nonetheless, the evidence adduced by Metro through Heckman shows that, at least "on paper," an equity cushion of approximately $17,401 does exist. However, because Debtor does not propose to make any further payments on the loan, this cushion shrinks each month Debtor fails to make the $3,293.18 payment. As set forth in Metro Bank Exhibit #3, Debtor will incur a per diem cost of $46.81 until the Property is sold. Since the hearing on this matter, the equity cushion of $17,401 has decreased by $3324 because the debt to Metro has increased. Further, in calculating an equity cushion other costs also must be considered. A significant cost, certain to be incurred, is the real estate commission of 7% payable to RSR Realtors under the terms of the listing agreement. If the Property sells for $440,000, the real estate commission earned will be $30,800. Even if Rothman agrees to take less than the full commission due under the agreement, this expense will erode any remaining equity in the Property available to serve as adequate protection for Metro's lien. Therefore, Metro has established cause for relief from the automatic stay under § 362(d)(1).

### B. Relief from the stay under § 362(d)(2)

Metro also alleges cause for relief under 11 U.S.C. § 362(d)(2), but it has failed to meet its burden under this paragraph. Under § 362(d)(2), a court must lift the stay if "(A) the debtor does not have any equity in such property; and (B) such property is not necessary to an effective

---

[15] Debtor testified that, on some unspecified date in 2007 or 2008, he received an offer to purchase the Property for $2.2 million from a real estate broker. The alleged offer was not in writing, but was made orally by the broker at Debtor's front door. Metro objected to this testimony, but I allowed it. Nonetheless, I attribute little weight to this uncorroborated and highly implausible testimony.

13

reorganization." 11 U.S.C. § 362(d)(2). The term "any" equity means that the court must consider all liens against the property at issue, not just those superior to the movant's lien. *In re Franke*, 268 B.R. 133, 134 (Bankr. W.D. Mich. 2001) ("equity" is defined as "the amount or value of a property above the total liens or charges.")

> The two prongs of § 362(d) are independent of one another. As a result, even the most adequately protected creditor can still seek relief from the automatic stay based upon the proposition that there is no equity in its collateral and the property is not necessary to an effective reorganization. Similarly, no matter how necessary the collateral might be to the debtor's reorganization efforts, if a secured creditor is not adequately protected, it is still entitled to seek relief from the automatic stay. [Section] 362(d)(1) and § 362(d)(2) serve entirely different purposes. The purpose of § 362(d)(1) is to ensure that a secured creditor is not harmed while the debtor attempts to reorganize its affairs. Section 362(d)(2), on the other hand, is designed to test whether the debtor is making sufficient progress towards a sufficiently realistic goal so that its efforts should be allowed to proceed.

*In re Brian Wise Trucking, Inc.*, 386 B.R. 215, 218 (Bankr. N.D. Ind. 2008).

In the matter before me, Metro has successfully demonstrated that Debtor lacks equity in the Property, but has not offered any significant evidence on the issue of whether the Property is necessary for an effective reorganization. Debtor is unemployed and proposes to fund his Chapter 13 plan through a sale of the Property. Accordingly, it is difficult to see how the Property is not "necessary" for his successful "reorganization." Thus, cause for relief from the stay under § 362(d)(2) has not been established.

### IV. Conclusion

Metro has satisfied its burden to prove that Debtor has no equity in the Property and that its interest is not adequately protected under § 362(d)(1). Debtor has failed to rebut Metro's

14

Case 1:10-bk-07373-MDF    Doc 46    Filed 05/19/11    Entered 05/19/11 15:44:02    Desc
Main Document      Page 14 of 15

proof. Therefore, Metro is entitled to relief from the automatic stay. An appropriate Order will be entered.

**By the Court,**

_Mary D. France_
Chief Bankruptcy Judge

Date: May 19, 2011